Ron, this is the first case of the morning. Call 209-440 Lopez v. Hoegberg, et al. On behalf of the Epilogue, Thomas W. Dillon. On behalf of the Epilogue, Mr. Bradley v. Talbot. Thank you, Your Honor. Please, the Court. Thomas Dillon, on behalf of the plaintiffs, Mr. Talbot and Mr. Ramlaw. I'm proud to represent the plaintiffs, Manny and Heather Lopez, both of them are in court today. But I do wish I were talking second. I'm sorry? I do wish I were talking second. But you'll get to go third, so. In presenting our case today, I would like to go over three salient points. The first of which I think is most important, and that's the basis for which I think the Court should reverse. And that is that there's a genuine issue of material fact with regard to whether Ron Hoegberg was within the scope of his employment at the time of this crash. In Pine v. Widmer, the Supreme Court said that only if no reasonable person could conclude from the evidence that an employee was acting within the scope of employment, should the Court hold as a matter of law that the employee was not in the scope of his employment. In this case, the trial court concluded, despite contrary evidence, as a matter of law, that Mr. Hoegberg was not in the scope of his employment. We ask you to reverse that. Now, I would like to emphasize some of the important facts. And some of the facts the defendants curiously omitted or glossed over, and in some instances, revised. On the day of this occurrence, Mr. Hoegberg, as well as dozens of other employees of Hamilton Sunstream Corporation, were all at an event called Team Building Activities. The defendants... Let me interrupt you for a moment. You just sort of moved from the basic notion that he was still in the scope of his employment at the time of the automobile accident. Now, in that sense, did it matter what he was doing earlier? Did it matter? Does the alcohol have anything to do with that? Would he still have been in the scope of his employment if he had nothing to drink? I believe so. I believe so, and here's why. At the time of the occurrence, he was doing something his employer had requested. His employer had requested that he bring equipment to the park, the facility that the employer owns, operate the equipment, allow them to use the equipment, and then comply with the rule of the employer, which is to remove all that equipment and take it away. And just as the other folks who brought materials or things to the park for the event, Mr. Hoegberg did the same thing. We had someone who brought cakes, brought them, removed them. Someone who brought a bar, brought it, and removed it. They were within the scope of their... Well, Chuck, are you... They were in the scope of their employment when they were removing these things and doing that stuff. I suppose that's true, but are you relying on that? What would it matter to you if there was no such rule and they could leave the music equipment and stuff there? Would it make any difference? I think I would have a different case than for sure, yes, I do. But I think the alcohol, to get to your earlier question, does play an important part in what he did earlier in the day because he consumes alcohol both during the course of his employment and during the course of an agency. Well, what I was getting at is, I'm sorry to keep interrupting you, is that I thought there was a rule that if the employer sends the employee to a different place than regular employment, not only does that mean it's his regular employment or a regular employment place, but he goes someplace different, and then when he leaves there, irrespective of what he did there, the details of it, but he's driving, and when he's driving from this other location, he's within the scope of his employment, and that would make all the alcohol and all that irrelevant. Am I right in that theory? I think you are right about that. That's Pine v. Whitmer. In Pine v. Whitmer, the employee goes to take a test in Rockford. Two and a half hours after the test, he's involved in a crash. Blood alcohol concentration, .187. No evidence of what he did between the conclusion of the test and the time of the crash. And the court said it was a factual dispute. Absolutely. So that gets to my point. What difference does it make to your case that there was a rule that he had to remove this equipment? What difference does it make to your case that he was drinking alcohol? Is it your case much simpler than that? He was driving from this not normal location, and that puts him in pain or pain in the scope of his employment. It is that simple if he's an employee, absolutely. The defense has argued that he wasn't in the scope of his regular employment because he's an engineer for this company, and on the day of the event, he's playing music, and he's there voluntarily, so he's not really in the scope of his employment. Wasn't he getting paid? He was still on the project. He was paid the full day, correct. And I agree with Your Honor that it is that simple, that he's coming from an irregular place of employment as the defendant employer, or excuse me, the employee in the Whitmer case, Pine v. Wooten. He was coming from the irregular place of employment. The court there said it was a situation. What did you mean then when you said that if that was the situation, you'd have a different case than you have now? That's what I'm trying to figure out. Well, because I think if the defendant is correct that Mr. Holmberg was not in the scope of his employment, I would make the argument that he was in the scope of an agency to provide these DJ services, and throughout that agency, which did not conclude until he left the facility, he was under the control of the employer because the employer had coercive power over him. The employer could always threaten to fire him, discipline him or something for not violating a rule or, excuse me, for not complying with rules with respect to his regular employment. So I think there are really two different things. The third factor of this is, though, when he's drinking during the scope of the employment and becomes impaired during the scope of the employment, we argue that the scope of employment is extended until that impairment lifts. And we've cited cases from other states because there's no one case that deals directly with it. But do we even really need to get there? I don't think so. I don't think so, but I'm hedging my bets. I thought that I had a clear case in the trial court that there was a question of fact, and I was deemed to be wrong by the trial judge. What is the question of fact? Whether he was within the scope of his employment when he was doing his activities or anything? There's no dispute that he was at a different place than his regular job site when he had left. And I think that's dispositive under Pine. All right, moving over to this area that we may not have to get to, the Supreme Court looked at this issue of expanding the social host liability and said we're not going to do that because we're leaving it to the legislature. Right. So wouldn't we assume the Supreme Court would say the same thing with this sort of expansion you're talking about? Yes and no. No because if it's within the course of employment, it's not an issue that's brought up by the Charles case. It's not an issue of preemption by the Dram Shop Act. It's vicarious liability through the course of employment, the scope of employment, and extending that scope until the impairment lifts. The first case, and I thought we might be the first case out of the proverbial Pandora's box, but we're not. A case came out of the first district last week interpreting Simmons and saying, Holtz and Charles don't apply because there was evidence that the defendant was within the scope of employment at the time of this crash that involved alcohol. Is that the Korean Airlines case? It is, Hicks v. Korean Airlines. And coincidentally, one of the decedents there was named Simmons. Try to keep that straight in our case. So I think that the alcohol issue, though, is important not in terms of who provided the alcohol, but if it's done during the scope of the employment, the employer should not get a pass by saying, Okay, employment's over, go head out on the road, and now you're outside the scope of the employment. So I think that the scope of employment continues with the risk caused by the impairment that was induced during the scope of the employment. And that's essentially what the California rule is. The restatement rule is slightly different than the California rule that we cited. In the restatement, the comment specifically notes that an employer owes a duty of reasonable care to a third person who may be harmed by an intoxicated employee with regard to the risks posed by the employee that the employer knows or should know. Such risks are especially likely to be foreseeable when an employer itself furnishes alcohol or permits consumption of alcohol within the work time or requires attendance at an occasion at which the employer knows alcohol will be served. And we have both of those things here. It's within the work time that the alcohol is served, and the employer has requested Mr. Hoberg to be at an occasion or event where alcohol would be served. Now this event is not a social function. It's not a picnic. The defense has characterized it as a picnic by actually changing some of the questions that were asked in deposition and bracketing the word picnic to persuade the court that this was a social function. This was a work function where employees of Hamilton-Sunstrand Corporation and only employees of Hamilton-Sunstrand attended, with the exception of a caterer. There were no family members, there were no children, there were no spouses, family, friends, anything. It was employees, and it was for the bottom line. It's to make the company more profitable. Perfectly reasonable goal, but they can't escape liability by denying them that what happened there was within the scope of the employment just because people were wearing grass skirts and drinking at a tiki hut bar. Let's talk about your inability to amend your complaint at the lower court. Do you have any comment? Say, for instance, we would reverse on the summary judgment issue. What do you feel your position should be with respect to amending your complaint? I think two things, Your Honor. With regard to amending, I think that reversing a summary judgment negates the primary argument that the defense has of untimeliness of the request. But I think that the argument of untimeliness of the request is in and of itself inaccurate because we requested leave to amend our pleadings in response to the motion for summary judgment under Title 5G. But I think that what happened is the second trial judge here, and we had these weird circumstances of who our judges were in this case because of the change. You have again. What's that? You do again. Yes, we do. We do. So we have the decision and then the order. And in between them, this court comes out with Simmons v. Hamadas. The court effectively ruled, the second judge effectively ruled, as a matter of law, that the facts that we presented in our proposed amended complaint were insufficient to state the claim. I don't think that's the right time to make that ruling. I think leave should be granted. And then under acceptable procedural rules, receive either a motion for involuntary dismissal or a 615 if they think it doesn't state the claim or a summary judgment down the road. But I think as to the timeliness issue, at least that's gone if the summary judgment is reversed. Okay. And Simmons is an interesting evolution of our law, and the Supreme Court affirmed virtually every word I could find in your opinion on it. The Supreme Court affirms virtually all of it. There's two things that I think are worth mentioning with regard to our case. Number one, the assistance or encouragement in the Simmons v. Hamadas case is most certainly more immediate, it's more involved, it's more one-on-one than I have in my case. However, I think the assistance or encouragement in my case is more coercive. And with regard to that, what I mean is that if Mr. Holker didn't comply with the rule that he thought existed, that he thought existed, he could be disciplined. And I find it important to note that the defense sort of glossed over this idea of whether there really was a rule that required the park to be cleared out, but there's plenty of evidence that, in fact, that was what the employees thought, there was a rule. Mr. Spana, who was the top employee at this event, testified that there are rules for the park, and he said whatever the rules were, he wanted employees to comply, he expected them to comply. Mr. Holmberg himself testified that he was required to comply with all the rules of employment when he was at the park, and when he was at the main facility on Harrison Street. He also said it was not an option to leave his belongings or his vehicle at the park because, quote, they needed to empty the park in case there was an event the next day. I then asked, was that the rule of HSA, Hamilton Sunstrand Associates? His answer was, I believe so. Mr. Spana said that he expected the employees to comply with rules of the park and rules of the corporation. Then there was this dispute about whether a vehicle was left overnight. Was there an employee who was over-served who left his vehicle there, and this was evidence that people really didn't have to get everything out. And the defense brought up a number of different bits of evidence, Joanne White's testimony and Mark Spana's affidavit, but what they glossed over was Vince O'Connor and Dan Martacci. Dan Martacci was the last man out the door. Vince O'Connor said he thought that there was one car left, but he wasn't there at the end of the evening. But with regard to clearing out the park, he said, because we have to return the park in the condition we came there in. We have to. It was an employer rule. And I asked him, that means you remove everything, right? His answer, correct. Mr. Martacci left and came back. He was the last man out. He was the man responsible, if you will. He's the gatekeeper and the key master. He had to close the gate and lock it up. I asked, was it your understanding from the rules that it required the park to be cleared up and cleaned out? Answer, they expect you to leave it the way you find it, but yes. Finally, he said, there was nothing in the park when he left. This is the disputed question of fact about the rule. There was no car. He says, I came back. I didn't see a vehicle. So there's at least a genuine issue of material fact on the scope of employment issue and whether Mr. Holmberg was really acting in the interest of his employer. We believe that he was acting in the interest of his employer and out of pursuit of his employer's interest. He's bringing equipment for the employer to use.  They use the equipment. And consistent with the rule, he gets it all out. And he's in the course of completing that part of the job when this collision occurs. And it's just minutes. It's just minutes after he leaves. Unlike the situation in Pine. What if they had this team-building exercise right at the factory or wherever he normally worked? I think we'd have a different situation because it's not the same place of employment. However, if the employer had asked him to go to his house, pick up his equipment and come back, I think he'd then still be in that sort of sub-agency. That brings up an interesting point for me. You just said, okay, in light of the fact that he was at a different, not at the regular place of his employment versus a regular place of his employment. And that's a question of law, is it not? As to whether he was in his regular place of employment? I mean, yeah. I mean, the issue is, as you pointed out, when Pine says, gives us direction as to whether or not there was a frolic or whether or not there was a departure from his normal path, you just indicated to Justice O'Malley that were he at his regular place of business, that we might have a different set of facts. Isn't that an issue? For the judge, it isn't an issue of law. Well, I think that it can be the same as a matter of law here because there's no dispute on the fact that Mr. Hochberg was not at his regular place of employment. Oh, I see. So you're just saying that the court made the wrong decision with respect to the issue. That's right. My time is up. All right, thank you. I'll turn it over to the counsel. Mr. Talcott. Thank you, Your Honor. Good morning. With me is Tori Haynes, Associate General Counsel at Sunstrand Counsel, Your Honors. This case is one that, first of all, involves the intersection of two really important, well-established rules in Illinois law. The first is that employers are not liable for injuries caused by their employees who become intoxicated at company events. The second rule that this case intersects is that an employee traveling to or from work is generally not acting within the scope of his or her employment. Well, then how do you distinguish Pine? You kind of avoided that, I've seen. I would like to think I didn't avoid it. Pine wasn't really focused on by a plaintiff until the rebuttal brief, the reply brief. So let me address, Your Honor, as well as the questions with respect to Pine. Let's start off with, in Pine, it's a frolic and detour case. Now that says one thing, but you have to read one important sentence in the case, and it says that for appeal purposes, the parties agree that Whitman, who's the employee, would have been in the scope of his employment with regard to the test, which was he was taking a test in a remote location, during travel incident thereto. In other words, there had already been a stipulation between the parties that Whitman, the employee, was within the scope of his employment. The frolic and detour question then came up, okay, now that we know he's in the scope of his employment, he's traveling from Rockford back to Elgin, does he make a detour when he takes one of these back roads? So for our purposes, Pine isn't particularly helpful. But let me go one step further. The court recognized that there was an exception to the general rule that employees who travel to and from work outside of their actual working hours are not in the scope of employment, where the employees are caused by their employer, and this is the language of the court, to travel away from a regular workplace, or whose travel is at least partly for the employee's purposes, rather than simply serving to convey the employees to or from a regular job site. I found it interesting that in the reply brief, the appellant said because Whitman, our employee that we had talked about in Pine, had traveled from his regular work site to take the exam, it's not a question of whether the employee is traveling from his or her regular work site. Under Pine, it's whether or not the employee is traveling from a regular work site. Now, you can ask, well, what about this park? Is that a regular work site? We know from the testimony that the park is owned by Hamilton Sunstrand Corporation. It's operated through this entity called the Hamilton Sunstrand Association, that the park is used regularly by Hamilton Sunstrand Corporation for activities such as the team building exercises that they have. In fact, for every year, this particular group has been using the park for their team building. Is that not a question of fact as to whether or not this park is a regular workplace? No, I think that's a decision that the court can make. That certainly wasn't contested at any point. Below, it was accepted, I think, by both sides. This is a place that regularly is used by the Hamilton Sunstrand Corporation to conduct team building activities and other events. After all, it is, and this came out during the course of the testimony, it is a park that is used exclusively by the Hamilton Sunstrand family. But isn't it a non-regular job site for this individual? That may be true, that he does not report every day to this place, to the park. That's not what Pine was suggesting. Pine was suggesting that it simply is a regular workplace. And let me say, this is where it gets a little bit complicated. I did take a look at all the cases I could find where the courts have found that there was not a regular work site. For example, think of Pine itself. In Pine, this employee is traveling to Rockford to take a test. That's an easy case. He doesn't work at the test facility, other than he simply takes the test for his employer and then he's on his way back home. We're assuming here that this test site is not another physical plant owned by his employer, right? That's correct. And there's nothing in the Pine case that suggests it is. It sounds like it's a test that's given by some outside organization. That's different from this case. The other thing that you do seem to find... Well, I'm sorry, what if the test had been given at a... maybe the company was going to have its own testing site? Then your argument would be that... I think that's a different case. Now, I don't think Pine would have come out the same way, unless, of course, again, the parties had already stipulated. But I think that is a different case. What we're looking to is whether or not this is a regular work site. I'll give you an example. Hamilton Sunstrand has plants throughout the United States, throughout the world. I'm sure that Mr. Hogg, at some point, went to the home office in Windsor Locks, Connecticut. What if he was there and he left and he had had too much to drink at an event at Windsor Locks? That's not his regular workplace, but that is a regular work site for the employees of Hamilton Sunstrand. The other thing that you do see, though, is often when courts... In fact, in every case that I could find where the courts look at the regular work site, they seem to look at the distance from the actual home site. This particular park is only a few miles away from the Rockford facility that Mr. Hogg normally worked at. As opposed to, if you look at the Pine case, he was traveling, I think I figured out, something like 33 miles from Elgin to Rockford each way. It's not something that could arguably be considered his regular workplace. Those were facts that were presented on record in those cases. That's right. So, again, I get back to my question. Isn't this a question of fact? I mean, you're saying that it should go one way. We should make a finding of law that the trial court was wrong and should have said as a question of law that this was not his regular workplace. You're saying as a question of law it was a regular workplace. How is it not a question of fact if you're talking about these cases that look at the distance? At some point in time, somebody had been putting the distance into the record in the trial court. Why is it not a question of fact? With respect to whether this is a regular work site, I think the record was clear, but I'll give to Your Honor that that could be considered, for the moment, a fact question. I don't think, however, the court below relied upon the distinctions that we're drawing now between Pine and this case. The court below, I think, found four factors, which were factors that it was in the record, it was summary judgment, there was no material issue of fact. With respect to, one, was he carrying home this audio equipment for the benefit of Hamlix and Sunstrand? The court said, well, yeah, I suppose the equipment was being used in the park for the benefit of Hamlix and Sunstrand, but the fact that he's carrying it home doesn't continue to make him within the scope of his employment. And the example that I had given at the trial level, and I think is still applicable, is what if he was, instead of carrying home his audio equipment, he was carrying home a computer? A lot of the businesses I represent say every night, you've got to take home your laptop, because I don't trust the cleaning people or whatever, so you have to take home your laptop. A lot of us carry BlackBerrys, but we're told by our employer, they might have an email address, which is my employer's email address, so I carry an iPhone. I take that home every night. But he would be leaving his regular job site, as opposed to a non-regular job site, as in this case, correct? That is correct, and that's why you can make, as Justice Burke said, the argument that there is, in fact, a fact question. But let me keep going, because the fact that we've got to be careful of is expanding this to the point where we have eaten up the rule, the rule that says that an employee traveling to or from work is not within the scope of his or her employment. I don't think anybody here disagrees with that. I think the issue here is, was it his regular job site, as Pine points out, and then the factors in the DeVia v. Yellow Cab. I think the issue before us is, is it a non-regular job site, which would put him outside of the argument that you're making that he's leaving work with his computer or with his BlackBerry? Was he not there to serve his master at this park? At the park, he was there to serve his master. When he left, he wasn't serving his master by removing from the park, which he was required to do, that with which he brought to serve his master. Let me answer that in two ways. First of all, in the second half, he was required to remove his car. There is no rule. No rule has been established. In fact, there was an uncontested affidavit of Mark Spadina that said there is no such rule. I think plaintiff's counsel confuses common courtesy, which is you get your car out of there and you take home the leftover potato salad, from some rule. No rule has ever been uncovered. There were some conflicting affidavits with respect to that, were there not? No, there's no conflicting affidavit. The closest plaintiff could come was Mr. Hogberg thought he was supposed to take everything out of the park. But the reality is Mark Spadina said there is no such rule. Joanne White said, come on. When someone was over-served, as did occur that day, they left the guy's car there and you can pick it up the next day. We all know what the other people were saying. You got to take home your tiki bar and your flip-flops and the food that's leftover. But clearly when someone was over-served, there was no rule that said you had to get that car out and we're going to push that person into that car no matter what their condition is. You feel that was clear? I think that was clear. I don't think, again, the trial court had to rely on it. I think the trial court did say that even if he had been ordered to leave the park, there was no evidence that this would continue the scope of his employment. I said I want to get to a second point that you raised. Let's assume for the moment that instead of being at Hamilton Sunstrand's facility, they have the party, the event, in the parking lot. Well, he doesn't normally work in the parking lot. Are we then going to make a distinction between the actual facility and the parking lot? What if he's at a facility which is outside of the normal place in Rockford, say five miles away where there's a warehouse or where there's another facility? Are we then going to say, well, that's not where he regularly works? I think what the courts are saying is you look to what is a property or a location which is a regular, not his, but a regular worksite for that company. And if you look at the cases, what they're distinguishing, Pine is not a regular worksite for those people. It's a testing facility. Here, this is a place where Hamilton Sunstrand employees only are allowed and, in fact, do regularly entertain themselves for whatever purpose they may have. What's the Hamilton Sunstrand Association that you said runs the place? What is it? Yeah. It's nothing more than an organization that is there to basically schedule the events. It doesn't really have any purpose other than to say if you're a member of the Hamilton Sunstrand family, an employee, then you get to use the park and you have to have some entity to sort of take responsibility for scheduling events as they take place. This park is locked, correct? It is normally locked so that others cannot use it other than those who have scheduled an event. Well, the decision-makers, the people who have the authority to say yes or no to an event, that would be the association. I don't have the answer to that question. I think they certainly decide who comes first, but I don't know if they sit around and they say, you know what, that's a good purpose and that's not a good purpose. What I'm driving at in getting into this level of detail is this company-owned and operated property, or is it company-owned but the company has some other entity operating, which is a social organization, a volunteer organization, that is not controlled by the company officers? No, this is a park that is totally controlled by the corporation. The park has no money. It collects no dues, anything like that. What does the record show about this association, though? Are the people who are on the association, do the company officers of the company designate certain employees to run the association and they get compensated for that? I don't think they get compensated. This is in the record, though, what the association is? There's very little about the association in the record, I'll grant you that, but my understanding from the record is that in order to be on the board of the association, you have to be an employee of Hamlet. Well, I mean, you get large corporations, even small corporations, sometimes have voluntary employee organizations that actually are service charities sometimes, which are not controlled by the corporation. So the record doesn't show us if it's close to that kind of an idea or something else. It does not. Okay. It seems to me you two guys have one very clear point of distinction. Your position, which you've made very clear, is this definition of a different, non-regular place of employment cannot include other facilities owned by the company. That's a general proposition. His position is your regular place of employment is where you are an employee, and if you as an employee are at plant A and you're sent to plant B, that's a non-regular place. Any case file that squarely addresses that? Assume that you've made a very clear distinction. I tried to just now. Do any cases address that, make a comment on that distinction? Yes. Before you go off, Mr. Farkoff, and answer Justice O'Malley's question, answer this question for me. How is it that we are supposed to rely on an unpublished opinion? You cited two unpublished opinions in your brief. Green and Korczak. You know I'm not. Oh. I just want to know what authority we have to rely on those before you answer Justice O'Malley's question. I provide the Court with no authority other than my understanding was an unpublished opinion. If it's a Lexis opinion, I thought it would be considered a published opinion. That would be my fault. If I'm citing a Lexis opinion and this Court says that is considered unpublished, I take full blame for that. Okay. I'm sorry. Go ahead. Your Honor, the Pine case was actually discussed more recently in the Marco v. County of McHenry case. The Court there found that a board member's attendance at a board meeting located in the courthouse was part of his duties as a board member. This is what the Court said, and I'll quote. Pine did not refer to a single normal workplace. Instead, it referred to a regular job site. Since in that case, the board member's name was Skinner, was, quote, clearly driving to a regular job site when he was driving to the committee meeting, unquote. They found that Skinner was not acting within the scope of his employment. They dealt with that Pine issue. This guy Skinner didn't work always in the courthouse. That just happened to be where the meeting was. So to answer your question, the Marco v. County of McHenry case did try to parse out that language from Pine. Well, that would demonstrate that some employees are going to have multiple regular workplaces. I mean, a guy who services the Xerox machine at every factory in the place goes around. He's got dozens of regular places. And this village board or county board member, that's what they seem to be saying there, he would go around the county and he'd have multiple workplaces. But what about a guy who has one regular workplace, he goes every day, and one day he's sent someplace else? Your position is if he's sent someplace else to another facility that's owned by the company, that's still a regular workplace. That's correct. Okay. Didn't Mr. Skinner in the Marco case was submitting on every occasion that he attended these, I think it was a subcommittee, if you will, meeting. He gave to the county his expenses, his travel. He was reimbursed for that by the county as part of his regular job, correct? That's right. And didn't they discuss that and draw that distinction from Pine as well? They did, but what was interesting was that even though he was getting paid the mileage and everything else, they said that he was not acting within the scope of his employment when he ran his car into someone. Our guy, Mr. Hogberg, isn't getting paid anything. And one of the distinctions I think is worth making with respect to Mr. Hogberg is that when he's driving home, the employer at Hamilton Sunstream has absolutely no control over him. He looks like any other, and this was important in the trial court, he looks like any other person driving his or her car. He could go home and he could make the foulest comments about whatever, and there's nothing that the employer could do. He's not someone who looks like he's within the scope of his employment. At the park, if he made a racist comment, of course you'd say the employer could discipline him. But if he's on his way home, they can't do anything about him. Let me, if I can, just simply address the Simmons case, the in concert theory of liability. There are two really critical points here that really distinguish the Simmons case. The Simmons case is a very harsh set of facts. First of all, the defendant in that case knew that the tortfeasor's conduct, that the driver's conduct, constituted a breach of duty. They knew he was drunk. They knew that they were going to have a public at risk when they poured the driver into his car. The second part is the notion of giving substantial assistance or encouragement in committing the breach of duty. The events of that case are so unique because the bar, the gentleman's club, actually put the driver in the driver's seat. They had to take a guy who they knew was intoxicated and put him into that car and risk the lives of people on the street. In this case, number one, there is no evidence that anyone knew that Mr. Hogberg had been over-served. There was nothing at all to suggest that in the record. Secondly, the assistance. No one gave him, told him, get out of the park. You've had too much to drink. He was allowed to pack up on his own some fairly sensitive audio equipment, had no problem doing it, and allowed to leave without question, without issue. That is not the facts of this case. Simmons is, without question, as the Illinois Supreme Court affirmed, the right decision. I don't think the in concert theory of liability applies in this case, and it was appropriate for the trial judge to say, why go through the process of granting leave to a man and then allowing the motion for summary judgment to be filed under the Loyola Academy standard? You've got to demonstrate that you have a plausible or successful cause of action, or at least one that would withstand a motion to dismiss, and the court said it would. For these reasons, then, we are asking this court to affirm the orders of the trial court granting the summary judgment to Hamlet and Sunstrand Corporation and Hamlet and Sunstrand Association, and denying the plaintiff leave to amend the complaint. All right, well, thank you, Mr. Falcoff. Mr. Dillon, rebuttal, please. Thank you. I'd appreciate it if you'd begin by addressing this very, I think it's a clear question now, what does it mean, a non-regular place of employment? Is it non-regular for the particular employee, or is it a non-regular place only if it's a separate entity from the corporation itself? Well, I think at worst, from my position, it's a question of fact as to whether it's a regular place of employment for the defendant driver or for the employer. Well, no, that's clearly a question of law. I mean, the law question is, I mean, whether or not this is what this particular place is. When I talk about the question of law, when the law says a non-regular place of employment, does the law mean something that's non-regular for this particular employee? And I don't believe so. I think Pine doesn't put in the distinction that Mr. Falcoff has urged the court to consider. By use of the indefinite article A, it's not clear from that decision if that's what the court means. And I think it's reading something in to suggest that it means a regular place of employment for this particular employer. This is not a regular place of employment, though. If Mr. Homer had gone to this park this morning. I think there's no question. It is a regular place of employment for the employer. It's also a place where they do have picnics and where people can have weddings and private events if they're employed by the company. So I don't think that it's a foregone conclusion, and I would dispute that it is a regular place of employment. For whom? For the employer or the employee? For Hamilton Sunstrand Corporation. And I grant that Windsor Locks in Connecticut, for example, the headquarters, would be a regular place of employment for the employer. But nobody works at this park. Nobody works there. So not for the employee. Or even for the employer, because no one works at the park. It's not a regular place of employment at that park. Nobody goes there and works every day or once a week. All the park management is done by HSA headquarters in Rockford, not in Belvedere. So I would dispute that it is a regular place of employment, even for Hamilton Sunstrand Corporation or Hamilton Sunstrand Associates, the employee association. Or for the employee. Or for the employee. Well, certainly for the employee, Mr. Homer. I thought the real foundation of your case was that this was a part of his employment when he was doing that. He was because it was a team-building activity for the company. This property is a controlled property. Hamilton Sunstrand Corporation owns it, and they decide what goes on there in conjunction with the association. They have corporate events there, just as they might have a hotel. That was something that was urged in the court below as to whether the same rule would apply if they had this event at a hotel or a convention center instead of at their own facility. And I think it makes all the difference that either place they go, it's not a regular place of employment for the employer or for the employee in this instance. So it's a non-regular job site. Correct. As set out in Pine. Correct. And I believe even the testimony is that that's not where anybody went to work on a daily basis. Their regular job site was on Harrison Street in Rockford. That was the regular workplace. So I don't mean to cavalierly switch from A to B, but the regular workplace. But I'm not still with you on this. I mean, if they have a facility someplace that the employer only uses once a month for some purpose that's clearly employment-related, they have a testing facility for some piece of equipment. They go there once a week. I mean, for one week, every month the place is used. Three weeks, it's not used at all. It's just shuttered. That's not a regular place of employment? In this instance, no. There's no one who's employed there. There's no one who's employed there. It's a park. It's empty. It's a fence with barbed wire around the top. It's not a regular place of employment for this company. So I think that the exception of Mr. Falcone's advancement is just not in the case law. I understand his reason for wanting it because it's case dispositive if it goes against him. Mr. Falcone urged that rather than a rule, what was really going on here is just a matter of common sense and that we were confusing common sense or courtesy, take the potato salad home with a rule. I say we let the jury decide if it's common courtesy or a rule. We have employees who testify that they have to, that they were required to. Those are mandates from the employer that the employees believe they were under and were required to comply with. It's not a matter of common courtesy of make sure we clear the potato salad out of the park. Let's let the jury decide what that really meant. And that's what the quintessential question of fact is. Finally, with respect to the Simmons case, I grant Mr. Falcone the distinctions that he discussed. I think I addressed them as well. We have some differences between our case and their case, but we also have some important similarities. I've talked to the court about the rule that I believe existed that required Mr. Holmberg to pull his car out with his equipment. An analogous situation occurred in Simmons where the club people in the valley said, get out of here. More direct, more involvement for sure. If I may finish, the Supreme Court ultimately said in regard to Simmons that the folks at the club left Mr. Hamada's one option, leave. That's the same thing that we can prove here that Hamilton Sunstrand Corporation and Hamilton Sunstrand Association left Mr. Holmberg with one option, leave. And that's what he did. On those grounds, we believe that this case is analogous to Simmons. We ask that you reverse the summary judgment, Your Honors, and send us back to the trial court with discovery open, which never was closed. We continue with this case and give leave to amend the complaint. All right. Thank you, Mr. Jonah. Both parties for the record. This matter will be taken under consideration.